Just a notice to future counsel, we are going to take a break after the next case, which is United States v. Suggs 22-24. We'll take that break for 10 minutes or so for logistical reasons. Judge Philipson, may it please the court. My name is Dan Hansmeyer. I'm with the Kansas federal offenders and I represent Perry Suggs. Almost two years ago in a published opinion, this court held that the search warrant at issue in this case violated the Fourth Amendment's particularity requirement. That the warrant could not be cured via the separability doctrine. In the court's words, because the warrant told the officers they could search for evidence of any crime, the warrant was so open-ended that it could only be described as a general one. Akin to the instruments of oppression vivid in the memory of newly independent Americans when the Fourth Amendment was adopted. In reaching this conclusion, this court emphatically rejected the government's claim that the officers could have interpreted the warrant as limited to the vehicle shooting under investigation. Quote, no reasonable construction of the residential search warrant can sustain the government's interpretation. The question in this follow-up appeal is whether the good faith exception nonetheless saves the fruits of the unconstitutional warrant from suppression. The answer is no. This court has never invoked the good faith in a case involving a general search warrant for a home, and there's no good reason to do so here. So I guess I'll just start with our position, which I think is pretty simple, and it's based on precedent. And it's based on precedent because Leon tells us that the good faith exception does not apply if, quote, a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. Leon also, excuse me, Leon also tells us that in implying this test, a reasonably well-trained officer is assumed to have, quote, a reasonable knowledge of what the law prohibits. And we know from many cases from this court that that means that an officer within the Tenth Circuit is deemed aware of Tenth Circuit precedent. The test is also objective, and officers' subjective beliefs are irrelevant. So what would an objectively reasonable officer have known? Well, first, we can start with the Fourth Amendment's plain text. Under the Fourth Amendment's plain text, a warrant must particularly describe the things to be seized. This warrant didn't do that. It included a broad catch-all phrase. That did not particularly describe anything, and any reasonably well-trained officer would have known the warrant did not apply with the Fifth Amendment's text. So second, under decades of precedent, a reasonably well-trained officer would have known that if a warrant includes a broad catch-all phrase to pass constitutional muster, the warrant must include the specific crime under investigation. It's a very simple rule. Counsel, would you agree that the first Suggs panel would not have remanded if they didn't think there was a legitimate question on good faith? I think so, yeah. I mean, that's what it says. You agree they thought it was an open question? It is an open question, yes. Would a reasonable police officer be held to know about the concepts of deference, or excuse me, severance, such as was discussed in the original Suggs opinion? What I'm getting at is that if the officer looked at the warrant and he saw this description under the miscellaneous category and said, whoops, but that can't be severed. Is a reasonable police officer supposed to be able to make that determination like was made by the first panel? Couldn't they look at it reasonably and say, well, predominantly, it's not about a general search. It's about weapons and residency verification. So I don't have Cassidy v. Gearing in front of me, but I'm 99% positive that there is a section in Cassidy that rejects that reasoning and basically says the question under Leon is essentially what the officer would have known, not whether the officer would have known how a court would apply a doctrine like severability. And I think that makes sense. I mean, what we want an officer to know. Well, then, OK. But then this officer, then, is looking at this attachment B holistically and sees in the sections above the miscellaneous section that has to do with, you know, the very things that were involved in this crime. They had to verify the residency and they were looking for weapons and ammunition. And looking at that, they, well, it's OK. It's about this crime. Yeah, I mean, I don't think that's how it would work because of what basically this court has already said about the warrant. I mean, this court in the first opinion made it very clear that no reasonable construction.  You just said you don't look at what, you know, the police officer is not looking at it like considering severance like the panel opinion did. Now you're telling me that the police officer has to look at it with the same eyes as the panel did. No. What I'm saying is that we know that a reasonably well-trained officer would have known the warrant was in lack of particularity because the panel in the earlier appeal essentially said that. They said that there was no reasonable construction. I mean, we can go through this, but when you look at the warrant on its face. He didn't have the first opinion in front of it at the time. But what he had was the warrant in a miscellaneous, I mean, this is all in the first opinion. The broad catch-all phrase is under a miscellaneous category. And like this court said, that means something other than the things above it. And so any reasonably well-trained officer is going to know I'm searching for guns, things related to vehicle and other things. And that everything else is a general warrant. So I don't think a reasonably well-trained officer could have read this warrant in that way. It's just, I think everything this court said in Sugg's Lawn is spot on. And I don't think we can ignore it. And I think it's pretty much controlling on that aspect of the case. Okay, well, that aspect of the case. But on the good faith side, let me take you to one place in Leon that I'm uncertain about. Which is, I guess, page 918, future reference. And what the court's talking about there is the whole purpose of suppression is deterrence. And that's what its eye is on. And in this sort of a situation where you have officers who need to, quote, scrutinize more closely the form of the warrant, the court says that any argument about being able to deter is speculative. And then it says, evaluate it on a case-by-case basis and suppress only in those unusual cases in which exclusion will further the purposes of the exclusionary rule. So spotting you. Everything that I think you've said so far, as well as anything in the first opinion. And of crime, the miscellaneous section, everything else. Do we still, after doing all of that and saying there's a Fourth Amendment violation, which has its own consequences, not only in this case, but maybe others. Once you have a Fourth Amendment violation, that doesn't mean suppression. Instead, we're going to now look at deterrence. And we're going to say, this officer did a lousy job reading the warrant carefully enough for relying on a form that his department used, didn't talk to the prosecuting attorney, whatever else. But still, that saying that by suppressing here, that's not going to deter that sort of conduct in the future. And if you contend that it is, the court says that's too speculative. In other words, giving you everything, you still lose. So I don't think that's right. And I don't think, especially in light of Grover Ramirez from 2004 from the Supreme Court, I think what we know about the Fourth Amendment, we know two things. We know that the home is first among equal. And we know that the impetus of the Fourth Amendment was to prohibit general searches. And I think when you put those two things together, we are in a rarefied area. We have a general search warrant for a home. So does deterrence matter or not? Yes. Okay, so we need to run it through the deterrence pipes, and we need to say that suppressing here would deter future violations. Yes. Okay. And if we say that it wouldn't, then we would affirm it. And I think if you were to say that it wouldn't here, you would have said the same thing in Cassidy. You would have said the same thing in Dodd. The Supreme Court would have said the same thing in Groh. I mean, there is deterrent value here because we have a string of cases where this has happened. Well, Groh is not a defective warrant, per se. There was something similar here, which is the warrant itself did not incorporate, in that instance, attachment B and the items to be seized, just the opposite of here, where it didn't incorporate the affidavit. But one thing about Groh, there is a glaring hole there that the Court leaves open, which is to say, if there had not been a fact dispute about whether he had told the wife of the man they were investigating, who was the only one home, here are the items that we are going to seize, even though we don't have the attachment. The Court leaves it open that that might be good enough. In other words, the technical violation itself doesn't necessarily mean that there isn't even a Fourth Amendment violation, let alone a good faith claim. Yes, I mean, with respect, I think that ship has sailed when this Court, five years later, decides Cassidy v. Goering. But beyond that, I think that little factual dispute in Groh is interesting because a few years after Groh, the Supreme Court decided the United States v. Grubbs and held that it didn't matter if you tell the person anything. So I'm not entirely sure what was going on there, but I don't think that is dispositive at all in this case. I think what I find interesting in Groh are the dissents. I think if you read the two dissents in Groh, they say exactly what the government is saying in this case and, of course, their dissents. And I think when this Court got Cassidy in 2009 after Groh has decided it did what it did and it found that the law was clearly established and the officers weren't entitled to qualified immunity, and as the panel said in the first appeal, this warrant is similar and just as broad and just as invasive. And as far as deterrence, you know, we have the cases that we talk about where this type of warrant has been presented. This Court has ruled on it before, you know, Cassidy v. Knox. Despite that and those precedents, the first panel in this case described the good faith question as close. I mean, I don't know why. You know, I don't think I lose this appeal because the first panel said it was a close case. I mean, I think I win this appeal even if the panel thought it was close. A close case doesn't mean. What you lose is the certainty that you're projecting here that those cases dispose of this case. I mean, even I think looking, if you want to look beyond those cases, there's just nothing, when you look at this precedent, there's nothing in this case that indicates good faith reliance on this warrant as the law has developed. And I'm running low on time. It's just general sloppiness. It's cutting corners. It's not reviewing good enough. But the information was there. It's not as though there was a defective warrant in the sense of there wasn't probable cause or something like that. It's not in that category. You say the same thing in Cassidy. You say the same thing in Dunn. I mean, the particularity requirement is a separate requirement in the text of the Fourth Amendment other than probable cause. I mean, two years after Leon, we get Malley v. Biggs from the Supreme Court, and the Supreme Court says a reasonably well-trained officer is an officer of reasonable competence. And Malley v. Biggs makes it very clear that the good faith exception protects us from the plainly incompetent officers, not just the corrupt ones. Well, what I'm really pointing at is I'm looking for help from you as far as why we should not affirm on the notion of lack of deterrence, which I just read you the passage from Leon itself. Again, I mean, if that reasoning made sense, I don't think you would have. I think Cassidy would have come out differently. I think Dunn would have come out differently. Well, Cassidy, of course, is a 10th Circuit case, and Leon is our prime Supreme Court case. And so I think you have to deal with that Leon language. Do you think there's deterrence to sloppiness? I mean, that's Malley v. Biggs, yes. If officers are plainly incompetent, the Fourth Amendment is there to deter that. And should Leon apply to deterring sloppiness? That's Malley v. Biggs, yes. Yes, absolutely. Isn't that a bit in conflict with the Supreme Court view in Haring? No, not at all. I mean, Haring is about reliance on a mistake, someone else's mistake. I mean, I guess that's true here when you have the warrant. Would you call, if it's mere negligence here, would you call it gross negligence? Well, I mean, with the precedent, the way the precedent has developed, this is gross. This is a recklessness. I mean, this is just, no reasonable officer would have taken this warrant to a judge. It's just, I mean, decades of precedent says you can't do this. It's just, it is what it is. Can I have you switch gears just a minute? Do you think our decision in Russia, United States v. Russia, which was post-Gro, is in conflict with Gro? I think it is in some respects, yeah. Yes. Do you know whether Gro was referenced in Russia? I would have to look. I don't. You don't? I don't know off the top of my head. Does it matter whether Gro was referenced? I mean, when the court rules, it's supposed to know about the Supreme Court precedent, so it was obviously aware of Gro. Then that suggests that that panelist thought it was not in conflict with Gro. I mean, the thing, even if there is no conflict, the thing with Russian is that it was not a dispute about the search of a home, and it did not involve a general search warrant. So, I mean, really what you do with Russian is, I mean, it's a computer search case. We know computer search cases are different. I mean, this court just said in, you know, there's a long line of precedent on computer search cases, being you look at how they were conducted, not what was said in the warrant. It's just a different context. So it's your view that Gro was a home? Yeah. And Russian was not? Correct. And that's, if they're not in conflict, that's a distinction? Yeah, I mean, you look at the most relevant precedent. You look at the on-point precedent. The on-point precedent in this case, you know, is Cassidy and Gro. It's not Russian. So even if there's a conflict, it's a different thing. I'm over time. I apologize. Thank you. Thank you. Thank you. May it please the Court, Bishop Grewell, on behalf of the United States. Gro, Dunn, and Cassidy are all cases where the warrant itself was so invalid on its face that an affidavit wasn't going to change anything. And that's not the case here. We know that in part because if that was the case, there was no reason to remand. This Court in Cites I could have simply said, it's a legal question. Look at it. It's so unreasonable. Deny the government's argument. Vacate the conviction. Be done with it. But it remanded because the situation here is very different than those cases. In Cassidy, you had a broad provision that occurs in the middle of three sections. And the third section following it, the first section is about marijuana cultivation, which was specific enough. Then you have the phrase that they say is like the one here. I think it's a little bit different. But then following that, you have a broad section about searching and seizing personal property related to any sort of statute. And that long paragraph that came after in Cassidy was one of the reasons that that middle part was considered to be overly broad. Here you have one line at the end of a list after much more specific items and after an affidavit, which you get to consider now, the specific items being car, guns, indicia of ownership. When you have those specific items, the last thing in the list then is going to be taken in light of that context and it's going to be looked at more narrowly. Not the same thing as Cassidy. Done. You had prefatory language at the beginning of the list. Including but not limited to. That made clear that no matter what specifics you had afterwards, that wasn't the limits of the warrant there. Finally, grow. Grow is a case where the warrant itself says that the thing that is to be searched for and seized is the house that they're actually going to be searching. And the Supreme Court says that's such a glaringly obvious error, if you even just glanced at the warrant, you would have recognized that. Those were all cases where the warrants were so plainly invalid on their face that you couldn't consider anything else. This court has something different than such one. When he's talking about how this court said it was reasonable. Wait a minute. Sure. You say this warrant was not so plainly invalid. The opinion in the original Suggs case says that the problem here is that no reasonable construction of the residential search warrant, be it technical, practical, or otherwise, can sustain the government's interpretation. That sounds different than what you just said. So let me tell you why that's different. That's when they're talking about the validity of the warrant. And there are three things that are different when you're looking at the good faith analysis. First, that's a statement where this court was trying to find what's the best reading of that provision. Not necessarily whether some other reading might be reasonable, but what's the best reading of it. Second, this court was sitting in the role of a reasonable jurist. Let me keep those thoughts and we'll come back to them. It says no reasonable construction. Isn't that in contrast to what you just said? I suppose it could be, but again, I guess that goes to my second two points then. Okay. This court was sitting looking as reasonable jurists, not as reasonable officers. And by the time it got to that point, it had distinguished and even overruled prior precedent. It had done a structural construction of it. It had parsed grammar, whether there was an indefinite or definite article beforehand. And so maybe it could come up that no reasonable jurist could come to that conclusion. But I think that's a little bit different than answering whether we're passing it. Well, you said no reasonable jurist? So that could be one possibility. But it didn't say that. It said no reasonable construction, be it technical, practical, or otherwise. That doesn't sound like a jurist. Fair enough. It's coming in the part where it's analyzing how good the warrant is. I think that probably goes then perhaps to my third point on this, is that what it was not considering. Okay, go ahead. Is what it was not considering at all here, which was the affidavit. And one of the ways that it distinguished Ortega Jimenez is that it misread Simpson. When we're looking at the validity, we can't consider that affidavit at all. We only get a look at the good faith portion. Now, Mr. Suggs is saying, no, look at Grove. They didn't look at the affidavit there, and so you can't look at the affidavit. But Suggs 1 didn't say, then look at the affidavit when you're doing the Leon analysis, did it? Correct, because it didn't actually get to the Leon analysis. It sort of remanded on that. And so it said we can't look at the affidavit when we're deciding whether this is valid. And so without looking at the affidavit, then is where it makes that statement about there's no reasonable construction. It's a different question when you're actually starting to look at the affidavit, which is what you do in the good faith context. They've argued you can't look at it because of Grove. And again, Grove is, again, saying, on the warrant it's saying you're supposed to actually seize the house. There's nothing an affidavit could have done to fix or change how you would read the warrant in that situation. There was no reason to look at the affidavit. But the two officers that were heading up the search, what were their two names? I think Officer Mentor was the main one who was heading up the search. They didn't read the affidavit. Isn't the evidence clear? They did not. They were told about it. So you're talking about Reed and Lloyd. So first, Mentor is leading the search and he informs Reed and Lloyd about what it is they're supposed to be searching for. And he's the one who's the lead on the search. And I can go into that component about whether they needed to read it or not. This court on remand asked. But for your point three. Yes. Is it important that they did not read it? No, because Officer. Because you rely on the affidavit. Because they were briefed by Officer Mentor, who was leading the search, who'd written the affidavit, who wrote it. What's important for good faith is that he had a reason to believe that the warrant was valid. He can then convey that narrow reading of the warrant to the others. And they can rely on the fact that he's their lead and he's the one who's reviewing it. And so he's the one who's going to second guess the magistrate, if anyone is. There's nothing in any of the case law that suggests everybody who's performing the search has to read the warrant. We do need to have an officer read the warrant. And here that was Officer Mentor. And then he needs to tell the other officers, here's what we're searching for. When you look at that affidavit. And I guess. So you are allowed to consider the affidavit. They've argued that you aren't. Again, that was because the affidavit couldn't save it. But I also point out, I think they're judicially a stop from arguing otherwise. If you listen to Suggs 1, Mr. Hansmeier, in a discussion with Judge Matheson, at minutes 448 to 613. What case are you referring to? This panel 1 in this one. Suggs 1, Mr. Hansmeier argued it for the other side in that one. I was not opposing counsel in that one. But he said in that one from minutes 448 to 613 in a discussion with Judge Matheson. I encourage you to go listen to it. That you can't consider the affidavit and whether it was signed when you're checking the warrants of particularity. But you do get to do that when you're looking at the good faith stage. So you're telling me that's in the oral argument but not in the decision?  That's how this court distinguished Ortega-Gimenez and said that it misread Simpson. Can you point out the first phrase where it says you can consider this affidavit when you do the Leon analysis? When it talks about Simpson. If you look at where Suggs 1 talks about Ortega-Gimenez misreading Simpson. It says, no, you don't get a, Ortega-Gimenez was wrong to say you get a look at it at the first stage. You can only look at it at the second stage. That's what Simpson said. That's what Russian did. I think Russian is really controlling here when you look at the three things they looked at to find good faith. They looked at the fact that the affidavit and warrant with the affidavit providing a narrower construction was. Let me refer now to Russian. When we do a good faith analysis, do we assume good faith? Or can we think, well, maybe this mentor, since he referenced in the affidavit all these other crimes this guy was involved in. And suspected of involved guns and menacing people with their guns. Do we assume he was good faith or he was seeking a lot of different evidence on these other crimes too? I think Leon says when you have a search warrant, we presume good faith. But we have an invalid. I'm sorry, what's that? We have an invalid search warrant here. So can you still do that? Right, but Leon's all about good faith. And so it's talking about when you have a search warrant that's invalid, we're going to presume good faith. And then it's the unusual bad, bad warrant that's not going to warrant good faith. And so when you look at the affidavit here and you look at the whole package that was submitted, you've got the warrant. Then you've got this attachment A, which is the affidavit that is all about the shooting incident. Okay, we're back to the affidavit now. What could be the possible reasons why the affidavit would include all this other history of this guy and his criminal past, rather than just referring to the fact that he was identified, we know the car, we know that's him, and we think he's at this address. Why did he have to do that? And is that suggesting something other than good faith? I don't think so. So two things. If you're talking about the criminal history point where there are actual convictions, that shows he's in illegal possession of a firearm. So it's another thing that that shooting incident is evidence of. But when you're talking about, there's also the list of the eight offenses at the end where he's suspected of them. And there's nothing suggesting that that means they're also looking for that in the warrant for three reasons. I think, first of all, the application itself says the reason we're putting that in there is I know based on my experience that if it looks like you've been involved with a lot of crimes, regardless of whether you've been convicted of them, you're more likely to have more than one gun. And so when we go search a residence, we shouldn't assume the first gun we find is the one you used in the shooting incident. We want to look for other ones. It's not suggesting warrant can also be read as find evidence of these other eight crimes. And the reason, one, there are no details about any of those other eight crimes. So you'd have no idea what you're even looking for. So you're saying that we ought to look at that reference to the other crimes of which he was suspected to justify seizing multiple weapons because we don't know which one the defendant used at this intersection. If you read the affidavit, that's what it says you should use it for. And after there's two pages about the shooting incident, it comes on the third page. It's a couple bullet points of those eight offenses. Seven of those eight offenses at the time the warrant was applied for, Colorado's default three-year statute of limitations for felonies would have already run. So there would have also been no reason to investigate those anyway. Surely you don't have a police officer when he's filling out the affidavit thinking, well, this doesn't matter because the statute of limitations has run off. Well, I don't think there's any reason to suggest that he was somehow looking for evidence of a crime seven or eight years ago when the first three pages of the affidavit are all about the shooting incident. So all the things that are included in the suspected crimes were all seven or eight years ago? There were eight offenses. Only one of them was within three years of the shooting incident. Eight uncharged offenses. Yes, the ones where he was just a suspect. And again, there's no detail on them other than here's the offense he's suspected of. Here's the year. No facts at all about what you'd even be looking for for any of those offenses. And so to suggest that those were somehow other things the warrant was looking for I just don't think makes sense. And so I really encourage you to look holistically. Volume one of the record, pages 50 through 55, which is the warrant. Then is the application, which includes first the affidavit, which again I think if you read it holistically is all about the shooting incident. And then finally the list that's incorporated that starts out first with the residency things, then the vehicle, then the guns, and finally that one line miscellaneous thing that if you read a the in front of the crime, which I think the officer reasonably could do after everything that preceded it, it's clear that miscellaneous is just to get stuff that isn't the car or the vehicles that would also be evidence of the shooting incident. Let me ask you this. A couple of GRO questions based on what you've said so far. You said the reason in GRO that they didn't look at attachment B, which is the item to be seized, is because the warrant was defective as far as saying the house was to be seized. But the way I read GRO is they didn't look at that because it wasn't incorporated by the warrant, and therefore it's off limits. Same thing here with the affidavit. That's point number one. Point number two, footnote eight of GRO, it's only I think one sentence, but it might be the key for me, which is that it says, although LEON involved application of good faith exception to the Fourth Amendment's exclusionary rule, we've explained the same standard of objective reasonableness that we applied in the context of suppression hearing in LEON defines the qualified immunity accorded to an officer, which is clearly established law. So is that equating clearly established law with good faith? And therefore, if you have a case on point that shows the violation, you're done under LEON and you're done under GRO. So three responses to that. One, yes, I think it is putting clearly established and that good faith inquiry on the same stage. I don't know what case we have here that is clearly established law, that what happened here is improper other than Sugg's one, which the officers didn't have when he filled out the warrant. And the third point, the affidavit, yes, they say we can't look at that, but they say that we can't look at that when they're talking about the warrant's validity. They don't say anything about it when they get to what we would call the good faith analysis, the clearly established law part. There, it's again, this, they say, if you just looked at the face of the warrant, you would see it's looking for that house, and there's nothing that could fix that. So it doesn't say you can't look at the affidavit at that point. It says you can't look at the stage one, which is what happened here. You can't look at it in Sugg's one. Well, you say you don't know what the clearly established law would be, and kind of echoing Judge Murphy here, looking at the first Sugg's opinion, Judge Baldock's opinion, the sentence, thus the invalid portions of the search warrant are just as broad and invasive as the tainted provisions in the Cassidy warrant. Sounds like clearly established law. I think after he did the analysis, he's just analogizing the Cassidy, but I don't think he's saying this is so clearly established or so plain on the face that an officer would realize this is a Cassidy situation, and I think for the reasons I gave, when you read Cassidy itself, perhaps Sugg's one misread Cassidy, much like Ortega Jimenez misread Simpson, but if you look at it, you've got this broad provision that comes after that language that makes it impossible for that middle section to be. So are you contending that Sugg's one is dicta in its discussion of Cassidy? No, I don't think so, but Sugg's one, I don't see how you can reconcile that it was saying Cassidy's the clearly established law. Let's remand to check on good faith. If it was so plainly invalid in the same way that Groh was or the way it happened in Cassidy or Dunn, there was no reason to remand. You just deny our argument. I think it's because it was plain for them when they're going through all the steps, as a reasonable jurist and without looking at the affidavit, that indeed this is an invalid warrant, but it wasn't plain enough for them to answer the good faith question. I see I'm over time, although I think there were 30 more seconds on the other side. I'm happy to answer any of the questions, but I'm also happy to sit down, Your Honors. Thank you. Thank you. You both did run over, but Mr. Hansmeier, if you want two minutes, you can have it, but I'll hold you to it. Okay, I'll take it. Thank you. So I do want to talk about the affidavit because I don't think the government gets anywhere with the affidavit. I think, Judge Murphy, I don't want to repeat what you said, but when you look at the warrant, the miscellaneous section, and everything above it is related to the crime under investigation, and you look at the affidavit that includes other crimes, the only reasonable interpretation of that miscellaneous section is we're going to be looking for these other crimes. So I don't think the government gets anywhere with the affidavit. With respect to whether you look at it, here's one way to look at it, and this is from page 27 of our brief. If a reasonably well-trained officer could have thought the affidavit was incorporated, you may consider it then. And there's a Third Circuit case that's cited in Russia, United States v. Tracy, and that's what happened in that case. The court kind of said, well, a reasonable officer wouldn't have known he didn't incorporate this, so we're going to consider it. And I think that might be what Russian did, although implicitly based on that site. But here, that doesn't get the government anywhere because this court in the first opinion said that the affidavit was plainly not incorporated, and the words not were actually italicized. So, one, on the law, you shouldn't consider it. Two, even if you consider it, I think it makes things worse for the government. All right. And really, other than that, I won't take up much time. I'll just end with in Arizona v. Hicks, Justice Scalia wrote for the court, he said, the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all, and I think that's this case. And I think the law is well established, clearly established, and this was plain incompetence and the good faith exception should not apply. Thank you. Let me ask you this. You were talking about the incorporation concept. Attachment B was incorporated. Do you think SUGS I would have come back differently if attachment A had not been incorporated by reference? That is, attachment A, which has the offending provision in it under miscellaneous. So, if attachment B is unincorporated, then this would be an even cleaner case, because then the warrant wouldn't have any description of any item, right? No list at all of the items above miscellaneous. All right. Okay, thanks. Mr. Gruel, I owe you a minute next case. We're finished with this one. And the case submitted, counsel are excused and we will stand in recess for ten minutes. Thank you.